## MOWRY *vs.* SILBER.

*In the matter of proving the last will and testament of* MARTIN SILBER, *deceased.*

If the will has been attested by strangers, evidence of the signature and handwriting of the testator may be resorted to, for the purpose of shewing his identity with the party executing the will.

The decedent was seventy-five years old, his mind and memory were impaired, and though he was not legally incompetent to make a will, it was *held* that a testamentary disposition of his property ought not to be sustained, unless proved to have been fairly made,—to have emanated from him of his own free will, without the interposition of others,—and to have accorded with his intentions otherwise expressed, or implied from the state of his family

relations. It is not enough in such a case to show that instructions were given by the testator, especially where he was so situated that the instructions may have been procured by undue influence.

An unequal will, executed by a person weak in mind and body, at the house of the party most largely benefited,—the execution not communicated to the children of the decedent, and the provisions of the will not being in harmony with his previously expressed intentions and dispositions—*Held,* that the ordinary presumptions flowing from the act of formal execution did not obtain; that the burden was thrown on the party seeking to establish the testamentary act of proving that precautions were taken and explanations had to secure to the testator the full and free action of his impaired faculties, and that in such a case the order of proof was reversed, and it should be shown affirmatively that no imposition was practised. Will *rejected,* on the ground that the proof was deficient in not affording such satisfactory evidence as the circumstances demanded.

J. H. HEDLEY, *for Executor.*

I. The identity of the testator as the person who signed, sealed, published, and declared the instrument offered for probate as his last will, is proved both by the subscribing witnesses to the will, as also by Hawkins, Mrs. Beckwith, and Mr. Shirley, witnesses for respondent, and by Mrs. Harsen and Anna B. Shrady, and other witnesses of contestant, who show collaterally where the testator was during this period, the room he occupied, and his death in and the removal of his corpse from the house of Mr. Mowry. If it was not Martin Silber who signed the will, who was it? (*Rutherford* vs. *Rutherford,* 1 *Denio,* 33; *Brinckerhoof* vs. *Remsen,* 8 *Paige,* 488; *Remsen* vs. *Brinckerhoff,* 26 *Wend.,* 325; *Chaffee* vs. *The Bap. Miss. Convention,* 10 *Paige,* 85; 1 *Sand. Ch. R., Grant* vs. *Grant,* 235.)

II. The soundness and capacity of testator's mind, are proved by the *positive evidence* of witnesses who had business with testator up to and until after his removal to Newark. On the part of proponent, the witnesses *never had a doubt* of competency, or supposed weakness, except Mrs. Reed; and on the part of the contestants, the witnesses differ and disagree, or speak from a knowledge

totally inadequate, their evidence being mere opinions from slight conversations with the testator.

III. Undue influence cannot be inferred from the evidence in this cause.

1. Because the testator intelligently gave directions himself for the will, having used no mouthpiece or medium. Mr. Mowry was a *spectator*, but gave no directions. He used no menace, *nor did he act*, or volunteer to act as interpreter.

2. It does not appear that any secrecy was used. Mrs. Rogers was away, but had been absent for ten or twelve days. Theresa was then in Newark, in attendance on her father. *This must have been so.* Why? Because *they kept no servant*, and Mrs. Mowry was in "*a delicate state of health*," and could not attend him. The duties of a sick room could not have devolved upon her in that situation.

3. If menace or persuasion had been used, the testator had his faculties, and would have mentioned the subject to Theresa, Mrs. Rogers, Mrs. Harsen, or other members of his family, in the interval between its execution and his death. There can be no doubt of it. He had abundant opportunity to reveal it, if he had chosen. Mr. Mowry was from home all day, except Saturday and Sunday, and yet Mr. Silber never lisped a word! "*Children and fools tell the truth.*" The contestants contend that here was " second childhood." And yet such must have been the complete subjection of this poor old man, that his mouth was sealed. He dared not tell. This conclusion is unreasonable and inconsistent with human nature, or the facts presented in this cause.

IV. The positions taken by the counsel for the contestants are denied, each and all of them, as unwarranted, specious, and unsound. The law as settled, cited in the argument, is quite sufficient to establish the will as being the last will and testament of Martin Silber, deceased.

P. REYNOLDS, *for Heirs.*

I. The evidence to prove the execution, by the *deceased*, of the paper propounded for proof is insufficient.

1. Although the deceased occupied the room in Mowry's house described by the witnesses to the pretended will which was executed by somebody in that room, and although the deceased died in that room, neither of the witnesses were acquainted with the deceased, or could say that it was *Martin Silber* who executed the instrument, except from the statement of Mowry.

2. In a case where there is ground to suspect fraud or imposition in obtaining the execution of an instrument *as a will*, the person who offers it for probate should be held to show *clearly and conclusively* its execution *by the deceased*, and not leave the Court to mere inference and conjecture on the point.

3. The proof in regard to the handwriting of the deceased ought not to be considered in the decision of the question of *identity*, as this is not a case coming within the provisions of the statute where evidence as to handwriting is admissible.

II. The instrument, if executed by the deceased, was not executed as the statute requires, to entitle it to probate.

1. Each of the *four* requisites prescribed by the statute for the due execution of a will must be clearly shown to have been complied with. They are not *one* act, but each should be a separate and independent act, and such was manifestly the intention of the Legislature. Neither of the witnesses to this instrument comes up to the letter or spirit of the statute in regard to its execution.

2. The mental and physical condition of the deceased at the time this instrument is alleged to have been executed by him, taken in connection with the other facts of the case, are sufficient cause for any court to hold the party

seeking to prove this instrument to a strict compliance with the spirit and letter of the law on this subject.

III. If the instrument was executed by the deceased, and with the formalities necessary to the execution of a last will and testament, its execution was procured by *undue influence*, and from interested motives, on the part of Mr. Mowry, named therein as executor.

Undue influence is fairly inferable—

1st. From the will being, in its principal provisions, contrary to the intention of the deceased, expressed at all times previous to the time when the lawyer was brought by Mr. Mowry to his house to receive instructions for drawing the will.

2d. From the fact that no evidence is given to shew a change of intention, or to afford reasonable ground for supposing such a change.

3d. From the fact that the provisions of the will are *unequal, unnatural,* and unreasonable.

4th. From the advantage Mowry derived in having the control of the property, in addition to the benefit he derived by the devise to his wife.

5th. From the weakness and imbecility of the body and mind of the deceased.

IV. The deceased was under restraint from Mr. Mowry at the time of the execution of the instrument, and hence it is not the *will* of the testator.

The executor is bound to make out affirmatively, by *proof*, in the language of § 14 of Title 1 of Article 1 of Chapter VI. of Part II. of the R. S., 3d ed., p. 120, " that the will was duly executed," and " that the testator, at the time of executing the same, was in all respects competent to devise real estate, and *not under restraint.*"

The presumption of *restraint* is strong—

1st. From the fact that the deceased, at the time of the execution of this instrument, was very feeble in body, on

account of age, infirmity, and protracted illness, and very weak and imbecile in mind, liable to be easily influenced and imposed upon, if not legally incompetent to make a will.

2nd. From the fact that the instrument was made and executed without the knowledge of any child or relative of the deceased, and with no relative, friend, or acquaintance near him to guard him from fraud, and protect him from imposition and fear, except Mr. Mowry, who was deeply interested in procuring the execution of the will, and who procured it to be drawn, and paid the expense ; and

3rd. From the fact that the execution of this instrument took place in the house of Mr. Mowry, at a time when the nurse of the deceased, Mrs. Rogers, was absent, and when he was under the entire control of Mr. Mowry, liable to be operated upon by promises and threats, and not in the enjoyment of that freedom which the law contemplates should be enjoyed to make a valid will.

V. The execution of the instrument was procured by fraud on the part of Mr. Mowry, and it is therefore void.

Although there is no positive evidence of fraud, the presumption of it is so strong, that the executor is bound to rebut the presumption by evidence, which he has not even attempted to do.

The facts from which the legal presumption of fraud arise are—

1st. The clandestine manner in which the execution of the instrument took place.

2nd. From the imbecility of the mind of the deceased when this instrument was executed, rendering him liable to imposition, and to be easily influenced—being incapable, in the opinion of those who knew him best, to make a will, and utterly unfit to transact any business.

3rd. From the fact that if the will is established, Mrs. Mowry will receive as much of the deceased's property, exclusive of the gore lot devised to Theresa, as the aggre-

gate amount of the several legacies bequeathed his other five children, and that no reason has been given for this difference so unfavorable to the other children, particularly to Theresa, a helpless child, and Mrs. Rogers, an invalid and widow.

4th. From the fact that Mowry is made sole executor, to the exclusion of the sons of the deceased, particularly Frederick, on whom he seemed to rely to do justice to all.

THE SURROGATE. This will was opposed by all the adult children of the deceased, except Mrs. Mowry, the wife of the executor, by whom it was propounded. The grounds of contest were, insufficient proof of due execution, and of the identity of the decedent; and that the will was obtained from the deceased, while in a state of impaired and debilitated mind, by means of undue influence.

In regard to the execution, I think all the proper formalities were observed; and though the witnesses were strangers to the decedent, yet there seems to be no just reason for doubting that the person who executed the will was Martin Silber. The proof of the signature by persons familiar with his handwriting is conclusive on that point, and instead of there being any objection to resorting to evidence of handwriting for such a purpose, it seems to me eminently proper in a question of identity to invoke that class of evidence.

In order to determine the other branch of the case, a large variety of circumstances must be considered.

The deceased was a German by birth, and spoke the English language with difficulty. He had retired from business, and during the last few years of his life his faculties became impaired; and after the death of his wife, which occurred in June, 1850, he gave himself up to grief and despondency. He had six children, three of whom lived with him at his residence in 16th street until the end of the month of April, 1851, when the family was broken up, and he went to the house of his son-in-law, Mr. Mowry,

in Newark, New Jersey. There the will was made, on the 14th of June, and there the decedent died three months afterwards, in the seventy-sixth year of his age.

Mr. Whitehead, one of the witnesses to the will, and the professional gentleman who drew it, states that he received his instructions from the decedent in person; and at a subsequent interview attended the execution of the will. He found him in bed apparently sick, and says, " I was particularly struck with the clear and, as appeared to me, perfectly sane mind of the testator. No testator that ever executed a will in my presence ever exhibited more signs of sanity than Mr. Silber. I observed no signs of defect of memory or understanding. I could not judge whether his memory was good or not, as I had no means of judging, except this transaction." " Decedent expressed himself very clearly and intelligibly as to the provisions of the will. I was particularly struck with it." " He was feeble. Had to be helped to rise out of bed when he signed the will. Mr. Price and Mr. Mowry both assisted him to the edge of the bed. He did not get out, but sat on the edge. He wrote his name with some difficulty. His hand was tremulous and feeble. Soon as he had signed his name, he was immediately put back in bed." Mr. Price, the other subscribing witness, states that the decedent " appeared to be rational and collected;" but he says, " I had no means of judging of his mind except what was then said. When I asked him how he was, he said, Very feeble, and he did not expect to live long. He was quite feeble." Doctor Pennington, who visited the deceased on the 9th and 10th of June, says, " I found him very weak at my first visit." " He was always in bed. He was very feeble." " I should think his mind was sound. The question never occurred to me as to there being any want of intellect. I had no conversation with him beyond inquiries as to his symptoms." " I discovered no traces of depression but what I could account for from his physical disease. He died of that disease. I saw no evidences of mental derangement, and

had no suspicion of it.   My attention was not directed in that way."   " If there had been any alienation of mind, I think I should have discovered it."

Mr. Reed, who lived next door to the decedent for eight or nine years, states that he was in the habit of visiting at his house until a year ago last winter.   He says : " I think he was a man of ordinary mind, so far as I was capable of judging.   I saw nothing to make me think differently." " I should think he was mentally capable of transacting ordinary business."   " I never noticed anything strange or extraordinary in his language or conduct, or anything that led me to suppose his mind was weak or imbecile.   I saw him occasionally after his wife's death.   That seemed to make an impression on him.   He talked a great deal about it.   That is the only difference I noticed."   " He conversed sensibly, as far as I was capable of judging."

Mr. Denham, who knew the decedent, and saw him occasionally for ten or twelve years before his death, says : " Shortly after his wife died he came to my office."   " I think the subject of his conversation then was the death of his wife.   That was pretty much all he talked about.   He appeared to be much grieved about it.   He expressed himself very feelingly.   I did not notice that he was not altogether himself."   " I considered him to be a man of ordinary mind.   I did not notice anything peculiar."   " I supposed he was capable of transacting ordinary business at the time of the transactions I had with him.   I did not look upon him as a weak, imbecile man, incapable of transacting ordinary business—such business as he was in the habit of transacting.   I presumed he was capable.   He appeared to understand the price he ought to get for his property.   He seemed to have the usual mind of a man in his sphere of life and business.   I can't say I saw anything leading me to suppose his mind was impaired."

Mrs. Reed, the wife of one of the previous witnesses, who was in the habit of seeing and conversing with Mr. Silber frequently previous to his wife's death, says he used

to talk about his younger days, and " used to tell the same story over and over again—always the same.  He used to do this very often."  " I considered him an intelligent man before Mrs. Silber's death; but the year after her death I did not think he was.  I thought he was a weak-minded man.  I think he failed a great deal—became weaker in body and mind."  " I did not think he was a weak-minded man till the year after his wife's death, and then I did.  He appeared to be easily persuaded."

Mr. McIntyre states that when he lived in the neighborhood, he had business dealings with Mr. Silber.  He esteemed him to be of sound mind, good judgment, and capable of making a good bargain.  But he left that vicinity about six years ago, since which period he met him only casually in the street, and exchanged a few words with him. He says: " I had, after I left the neighborhood, no such communications with him as to enable me to judge of the soundness of his mind, except that when I did see him I observed nothing indicating unsoundness but the effects of old age, and that he was getting feeble."  " I don't think I saw him after his wife's decease."

John Hilton, who knew the decedent for twenty years, and traded with him when he was in business, states: " I considered him capable of transacting business six years ago."  " I considered him a bright man, taking in view the disadvantages he labored under, from speaking English imperfectly."  " He was in the habit of coming to my store, sitting and talking, may be, quarter or half an hour." " The last time I saw him, to talk with him, was about three months before his wife's death.  At that time I observed no failure in his health.  I observed no change in the capacity of his mind at that time.  He did not seem so bright as before.  He was rather dull, and could not comprehend so quick as formerly.  He did comprehend, but not so readily.  I rather think he was then affected by his age ; but not to such an extent as to make him incapable.  He knew very well what he was about."

Mr. Johnson, a grocer, who knew the decedent about three years, and spoke with him not over three times a year, says: "I last conversed with him about a month or two before his wife's death. When he came to pay his bills, he seemed to understand what he was about." "I always thought he was capable of transacting business; but had very little chance to judge."

This ends the list of the witnesses brought to sustain the capacity of the decedent. It consists of the two gentlemen who witnessed the will—one of whom never was in his company before, and the other had seen him only once previously; of the physician, to whom he was a stranger; Mr. Reed and his wife, neighbors, who saw him frequently; and Denham, McIntyre, Hilton, and Johnson. Mr. Whitehead formed his opinion mainly from the manner in which the decedent gave the instructions for drawing the will. Mr. Price was not in the room even when the will was read, and had no other opportunity of judging, than was afforded by the few words that passed when the will was executed; and Dr. Pennington had no conversation with him beyond the usual inquiries in respect to his symptoms. Mr. Reed's opinion is entirely overborne by that of his wife, and by the facts on which she based her conclusions; and her means of observation were far superior to his. Mr. Denham saw the decedent but once after the decease of his wife. Mr. Johnson, to use his own words, "had little chance to judge" of his capacity, and conversed last with the deceased a month or two before his wife's death. Mr. McIntyre did not see him after his wife's death, and for the last six years had only exchanged a few words with him in the street. Mr. Hilton was in the habit of social intercourse with him to a later period; but had no conversation with him since about three months before his wife's decease, and then he thought him affected by age, and more dull than formerly, though not to such a degree as to render him incapable.

The evidence on the part of the contestants comes down

to a more recent date, and is derived from parties who possessed better opportunities of forming a correct judgment.

Charles Feitner, a brother-in-law of the deceased, and a witness for the executor, says : " I observed a very great alteration in him after the death of his wife. He gave up to grief." " He seemed to sink in health after his wife's death. He became very feeble. Before his wife's death, so far as I knew, his mind was sound. His habits were very singular—were German. He became very melancholy after his wife's death. I did not see him very often. There was no insanity; but after his wife's death, I should not think him capable of conducting business." " His mind became so melancholy and unconcerned that I think he was incapable of doing business."

John Doyle, who married the decedent's neice, and knew him for twenty years, says : " In point of intellect, I should consider him a very plain man indeed—I should think below the medium rate of capacity, in his brightest days, I mean. I saw him after his wife's death. I discovered a very material change in him. He appeared to be perfectly like a child ; had no animation whatever in his manner of speaking. When you would speak to him, he would just answer the question, and seemed hardly to know what was said and what he was saying. His chief conversation was, that he wished to go where his wife was." " He appeared to fail both in body and mind ; and I think in mind most, from his appearance. He appeared to me to be perfectly stupified—to have lost all animation. When I saw him, he was lying down. He seemed to be perfectly stupid. I should not think he was able to concentrate his mind on any given subject so as to do business." " I last saw him some weeks before he went to Newark. That is the only time I saw him after his wife's death. I should not think he was of sound and disposing mind, and capable of making a will at that time."

Dr. Nelson, who was acquainted with the decedent for the last ten years of his life, and for a part of that period

was his family physician, says that in his brightest days "he was a man of limited capacity." "He was certainly not the man, mentally, the last two or three years, that he was when I first knew him." "I never thought he was idiotic. I doubt if he was capable of taking care of his interests in the last few years. I can only judge from my general views of his character. He was what I should call childish." "I don't think he was an idiot, or insane, but he was partially imbecile or childish."

Dr. Wells, who knew the decedent over twenty years, says that "for the last ten or twelve years there was a falling off in his capacity, which, for the last four or five years, became more marked. His bodily and mental vigor were very much impaired by the ravages of time, and the circumstances attending his trials, cares and pains." The Doctor attended him on one occasion, after his wife's death, in April last, and states that he then "seemed almost lethargic." "He evidently was affected by the death of his wife; for from that time he was worse in body and mind." "The last three or four or five years"—"I should not think he was capable of transacting business. I should think he was childish. He was growing uniformly more infirm as to his mind in the last four or five years."

Catharine Harsen, a sister-in-law of the deceased, who knew him thirty-seven years, says : "Before the death of his wife, I discovered a change in his mind. His mind grew duller. I thought his intellect was a great deal weaker." "He was very much affected by the death of his wife, so that he cared for nothing." "His mind was affected by her death. He said. he would as lief die as live."

Mr. Denman, who knew the decedent for fifteen years, says : "There was no particular difference in his intellect, that I ever discovered, until the decease of his wife. He then seemed to be failing ; and in his conversations subsequent thereto, expressed, as his only wish, a desire to depart and be with her. His mind was then weak and feeble—

confined to one idea. I should think he was not then capable of disposing of his property with any intelligence." "He did not recover from grief, as other men do. He shewed no aptitude for anything else, except to die. His whole sense was swallow ed up in that sentiment."

The Rev. Mr. Crawford, the minister of the church to which the decedent was attached, and who visited and conversed with him frequently after his wife's death, says: "When I first became acquainted with him, he appeared to me to be in a broken state—not by any means to be enjoying his full strength of mind. He complained to me of failing memory, and of great timidity. This was before his wife's death. I noticed immediately on the death of his wife, I thought, a very decided sinking in mental power and physical health both—a general giving way of the forces of life. I think his weakness, mental and bodily, rather increased. He seemed less and less collected in his conversations." "This sinking appeared to me to continue till I last saw him. It appeared to me he was not of sufficient mental capacity to make a will at any time after his wife's death." "I should have called him a childish old man. The childishness increased very manifestly after his wife's death." "The death of his wife weighed upon him very heavily. His mind could scarcely be diverted from it. That seemed to be the one idea." "His mind was very inactive. Sometimes, when I was speaking to him, he appeared to settle away, and not to notice anything around." "His incoherence was more discoverable on other subjects than on his wife's death. It was evinced in stating the same thing over and over again, on different visits and sometimes on the same visit, as if it were quite fresh." "When I last saw him, there was considerable change, as to the state of his mind, from what it was when I first saw him. It seemed to be an aggravation of the same difficulties under which he labored when I first saw him—the loss of memory and confusion of mind—added to which there

was a settled melancholy for the loss of his wife, from which I never saw him aroused."

Without going further into details of this kind, it is enough to say that the same general view of the decedent's mental condition was taken by several other witnesses, whose means of observation were quite equal, if not superior, to those of the witnesses on the part of the executor. The evidence very clearly preponderates towards the conclusion that for several years the mind of the decedent was failing in vigor and tone. He retired from business, depended more on his family, and when his wife died, surrendered himself to melancholy and despondency. His memory became impaired; he repeated the same thing several times in the course of the same conversation; he cried when his wife was alluded to; and, to use the language of one of the witnesses, had a "monomania" on that subject. These facts are established by persons with whom he dealt, and by his brother-in-law, nephew, and sister-in-law, two physicians who had attended him, and the clergyman of the church to which he was attached. Though a state of absolute legal incompetency is not shown, yet the mind of this old man was so impaired that a testamentary disposition of his property should not be sustained, unless affirmatively proved to have been fairly made, to have emanated from him of his own free will, without the interposition of others, and to have accorded with his testamentary intentions, otherwise expressed or to be implied from the existing state of his family relations.

Several of the witnesses, who enjoyed excellent advantages of observation, state that the decedent never indicated any preference or partiality among his children, unless it were for Mrs. Rogers, William and Theresa; and there is not a breath of evidence tending to show peculiar favor towards Mrs. Mowry. Some years before his decease he gave each of his children, except Theresa, a lot on 36th street. The one designed for Theresa was sold, and he intended to give her another in lieu. Subsequent to that

time his wife suggested to him the propriety of making a will, for the purpose of securing the lot to his daughter Theresa, who was a minor, he "being satisfied with the disposition the law would make of the rest of his property." After his wife's death, in the winter of 1850–'51, the deeds were placed in the hands of Mr. Reynolds, upon the understanding a purchaser was to be found, and the lot sold on a long credit, and a mortgage taken to Theresa; and thus the supposed necessity for making a will would be obviated. (2 *R. S.*, 3*d* ed., *p.* 38, §§ 23–26.) "Subsequently," says Mr. Reynolds, "Mr. Frederick Silber called on me for the deeds, saying they thought they had found a purchaser, and wished to show him the deeds. I heard no more of it till I heard of Mr. Silber's death." Mrs. Reed states: "I recollect once, after his wife's death, he told me Theresa had been crying about her mother's death, and he told her not to grieve—he would leave her enough to take care of her." Mrs. Harsen, his wife's sister, says, "His wife often wanted him to make a will. He said there was no occasion for it. His oldest son, Frederick, would see all things right after their death." About two weeks before he went to Newark, this witness conversed with him. She says, "He showed no partiality among his children. He said he thought as much of one as another."

Under such circumstances, it would be reasonable to expect that a will, if made, would provide equally for all his children, after devising to Theresa the lot designed for her. The instrument offered for proof devises that lot to Theresa, but also gives his dwelling house on 18th street to Mrs. Mowry, subject to legacies of $650 to each of his other five children. These legacies were payable, without interest, at the end of a year. The house is worth some $6,000. Thus, with the exception of Theresa's lot, almost the entire half of the estate is given to Mrs. Mowry, and the remainder among the other children. This is unequal, and finds nothing to support it in any glimpse we can obtain of his intentions in respect to his property, or of the state of his

affections towards his children. He had a right to make such a will; but satisfactory evidence should be adduced that he did make it—that in his weak condition of mind he was not unduly biased or influenced to the performance of an act discordant with his previous intentions.

Much stress is deservedly laid in cases of this kind upon the instructions. But it is not enough that the instructions should proceed formally from the testator to the draftsman. Nothing is easier than to supply such important evidence, by preparing the mind and moulding the will beforehand, so that no trace of the controlling influence need be discovered, except so far as must appear in the nature of the instructions. Mr. Whitehead, the counsel who drew the will, says, "He simply gave me his directions—gave me no reasons for the bequests he directed. He appeared to have made up his mind previously as to the provisions of the will. That was undoubtedly the case." "I made no suggestion, but took his instructions and acted upon them. I think I simply received his instructions, and did not go into particulars." Mr. Whitehead states that he was "particularly struck" with the clear and intelligible manner in which Mr. Silber expressed himself as to the provisions of the will; and he says the "decedent spoke English well, fluently, so that he could be well understood, but with a slight German accent." It is certainly remarkable that such instructions should have been so clearly given, and that the decedent should have spoken so fluently as to be readily understood, when the evidence in the case conclusively establishes that Mr. Silber understood English so imperfectly, and spoke it in such a broken manner that it was difficult to understand him, and necessary, in order to hold a protracted conversation, to repeat and explain frequently. I have no doubt of the correctness of Mr. Whitehead's testimony; but it is susceptible of reconciliation with other evidence, on the supposition that the decedent had *previously* made up his mind, which, indeed, Mr. Whitehead says "was undoubtedly the case." Very little, if any, weight

is to be given to instructions under such circumstances, except so far as they go to show that if the testator had been previously tutored, he had mind enough, for the moment, not to forget his lesson. Mr. Mowry was present when the instructions were given, and the only remark he seems to have made was an expression of dissent when he was named as executor, to which the decedent replied, " very emphatically, I wish you to be the executor." That he knew something relative to the proposed contents of the will is evident from his statement to Mr. Whitehead, that his father-in-law wished him to be executor, and he did not wish to be. Mr. Mowry engaged the lawyer to draw the will, arranged about the fee for drawing it, suggested who should be the subscribing witnesses, fixed the time for its execution, and was the single person present when the instructions were given and when the will was read, the other subscribing witness, Mr. Price, not being permitted to attend that part of the ceremony, but being placed in the parlor until it was over. What became of the will afterwards does not appear; but there is no evidence that the fact of its execution was known to any member of the family until after Mr. Silber's decease. If the will was made by Mr. Mowry's procurement, this is not singular; but that the decedent should not have divulged it, is more remarkable. Mrs. Harsen, his wife's sister, visited him at Newark on the 11th and 31st of August. On the first occasion, she sat in his room nearly an hour. She asked him if his affairs were settled in case of death; and he, answering in the affirmative, said, " My oldest son will see to it—Frederick;" and subsequently, on her speaking in relation to Mrs. Rogers, he said, "It would be made equal and right with all." There is another feature of the transaction of no slight importance. Mrs. Mowry appears to have been in delicate health, and unable to attend her father; and there was no other person in the house belonging to the family, except Theresa—and yet Theresa was not seen, either on the occasion of giving the instructions or of

executing the will.  Mrs. Rogers was then in New York.
Dr. Pennington was called in on the 9th of June, and
visited him again on the 10th and 24th.  Mr. Whitehead
fixes the date of his instructions from two to four days be-
fore the 14th, the day the will was signed.  That this sick-
ness suggested the occasion for drawing the will is quite
possible ; but, from the 10th to the 24th the physician did
not visit him, and there was no apparent reason for hurry-
ing the execution.  Mrs. Rogers returned on the 14th, and
became his regular nurse and attendant; but the will was
executed before her return, in the afternoon of that very
day.  These circumstances may be susceptible of explana-
tion, and I am not inclined to draw harsh inferences from
them ; but, unexplained, they present the appearance of
clandestinity.  We find this weak-minded old man, broken
down by age and disease, and depressed with grief, alone
with his son-in-law ; and then this will is begotten, having
but a single feature in harmony with all that we know of
his previous intentions and dispositions, and that feature
one which it would have been palpably fatal to have left
out of the instrument.  I do not mean to say that the cir-
cumstances prove fraud ; but so far from establishing the
fairness of the transaction, they have a different tendency.
Nothing but the most clear and satisfactory proof of free-
dom from control, and of self-volition, could sustain *such* a
will of *such* a testator.  An old man of decayed mind, the
father of children equally the just objects of his bounty,
should not have been permitted to perform such an act
without every care taken to show that it was his own desire,
and not another's device.  His children should have known
it ; there should have been no secrecy.  And yet the sole
person near him is his son-in-law—the person most deeply
interested in the execution of the instrument ; and, in con-
sideration of the mental infirmities of the decedent, his
difficulty of expressing himself intelligibly, and of compre-
hending others readily—facts abundantly proved—the
ordinary presumptions flowing from the act of formal exe-

cution do not obtain, but the burden is thrown upon the party seeking to establish the testamentary act, to show that all those precautions were taken, and those explanations were had, that were necessary to secure to the party the full, free and unbiased action of his impaired faculties. In such a case, the order of proof is inverted. "It is almost superfluous to observe," says a distinguished commentator, "that in proportion as the infirmities of a testator expose him to deception, it becomes imperatively the duty and should be anxiously the care of all persons assisting in the testamentary transaction to be prepared with the clearest proof that no imposition has been practised." (*Jarman*, 1, 30.) The instrument now offered for proof is, in its most prominent characteristics, at variance with the intentions of the deceased, as proved by the state of his affections, his previous declarations and acts. All of the family were absent from the execution; strangers were the witnesses; besides them, the sole person present was the husband of the chief beneficiary; none but Mr. Mowry's hand is seen in the affair from its inception to its close. There is no indication that the will was known to the family to exist until after the decease; and, whether contrived or not, the whole transaction was in fact accompanied with complete privacy. In view of the mental and physical weakness of the decedent, I cannot, in the face of such facts as these, sustain this will; and it must, therefore, be denied probate, on the ground that the proof is deficient in not affording such satisfactory and decisive evidence as the circumstances demand.