CREELY AND OTHERS *vs.* OSTRANDER.

*In the matter of proving the last Will and Testament of* SAMUEL S. ENGLE, *deceased.*

A will contested on the ground of incapacity and undue influence pronounced for —the testator's faculties being unimpaired, though he was in his 84th year, and enfeebled by disease—and the circumstances showing origination of the bequests with the decedent himself, mental activity, freedom and determination of volition.

Action upon the suggestion of others is not sufficient to impeach the transaction, in the absence of every trace of improper dealing or undue influence. The omission of the name of a relative in a partial provision, by mistake or accident, would not seem to justify rejecting the entire instrument. The jurisdiction of the Surrogate, in respect to the correction of mistakes, is, by the necessary operation of the statute, merely negative. and limited to refusing probate to a will or part of a will. Nothing can be inserted in the instrument.

B. S. BILLINGS *and* C. W. SANDFORD, *for Executor.*

1. The will was drawn from full instructions of the testator himself, at two or three different interviews with the counsel who prepared it, and who was employed solely by the testator himself.

2. No undue influence, or influence of any kind, is proved to have been exercised by any person.

· 3. All the witnesses examined by objectors, as well as the subscribing witnesses, prove the competency of the testator to transact business.

The three witnesses, Johnson, Kerr and Ray, who were produced to prove failing powers of mind and memory, fully show capacity : and are not as competent, and had less means of judging than Daniel Lord, Esq., who saw him at a later period.

4. The regular execution of the will is fully proved by the subscribing witnesses.

5. The objectors' own witnesses fully prove the absence of all fraud, undue influence or want of capacity.

S. B. HELBERT JUDAH, *for Contestants.*

I. The evident intent of the decedent, his favorite project of the charity school being abandoned, under the views of the law given him by Mr. Lord and Mr. Lowerre, was to dispose of his property *among his relations.*

Although he may have appeared to the witnesses to the will of "sound and disposing mind," yet it is evident, his memory had failed him, in respect to the names of those relatives.

The time of the making and executing the will is the time, and the *res gestæ* of that period, are alone to be regarded. Admit the force of Mr. Lord's statement as to his capacity—three weeks had elapsed between that period and the making of the will. Lord states he was, when he saw him, bedridden, and so low that he expected the next news he heard, would be of his death. Is it not evident, that his faculties sinking under the infirmities of age and sickness, were not equal to the task of making an equitable distribution of his property among his relatives?

A disposing mind and memory is defined to be,—a mind and memory which have the capacity of recollecting, discerning and feeling the relations, connections and obligations of family and blood. (*Den* vs. *Johnson*, 2 *South.*, 454).

Here were relatives of the decedent, with whom he was in affectionate intercourse, among whom is his only surviving sister, an aged woman, in poor circumstances, on affectionate terms with him, and the very first on the list named from the lips of the decedent to Mr. Lord, omitted in the will, without a reason given by the decedent.

Was then the decedent, when the will was made, in that state of mind and memory, referring to the fact of this omission of his sister, for recollecting the property he was about to bequeath, the manner of distributing it, and the objects

of his bounty. (4 *W. C. C. R.*, 262; *Washington, J.*, 3 *W. C. C. R.*, 580).

II. Taking then the fact to be that by sickness and the infirmities of age the decedent's memory was so far impaired that he required assistance in remembering the names of his own nearest blood relatives, (and this appears from Lowerre's testimony), the decedent's intent as to leaving his property among his relatives being clear, is this will, omitting the decedent's only sister, the will of the decedent?

The decedent directed, as the testimony of Mrs. and Mr. Summers shows, William Rodgers to make out the list of his relatives—he named one or two—the rest, with the exception of two or three added by Mrs. Summers, were written down by Rodgers on his volition. For what purpose was the list—the design is stated to be, to put them in the will—so evident is this fact, that when it was afterwards discovered by Mrs. Summers that Mrs. McLean's name was omitted, and this was not until after the will was executed, she was much troubled, admitting the name was neglected, not by the wish of the testator, but by Rodgers and the other makers of the will—does not the fact show that the will is not the one designed?

The decedent intended that his relatives should enjoy the property during the two lives named by him.

Whether the names of the relatives be omitted by fraud or by neglect, it is the same—the intention of the testator is manifestly not carried out in the will, but in part defeated.

III. There is every reason to believe the names were omitted designedly—Rodgers must, from his connection with the parties, have known of their existence. It is no argument that the decedent heard the will read when he was so weak and feeble as to be unable to sign his name, and assented to it on the different claims read to him, if he supposed all his relatives were named therein. That he so supposed is apparent by allowing the name of John Shepard to be inserted—the very feebleness of the decedent yielding to Shepard's request —the argument arising between Shepard, Lowerre, and the

others, as to the fact whether Shepard's name was in the will or omitted, during which the decedent was passive, shows that although the provisions of the will may have been the design or emanation of the testator himself, the beneficiaries were not his naming, but those of Rodgers and the others at his bedside.

IV. The proper beneficiaries as intended by the decedent not being named in the will—the will is not the will of the decedent, it does not correctly incorporate his testamentary intentions, and should be pronounced against and not admitted to probate.

Intention is the very foundation, corner-stone, and essence of a will.

It is this principle which governs and tests the making or revoking of a will. (*Worthington on Wills*, 569; *McCully & Barr*, 17 *S. & R.*, 445; *Burger* vs. *Hill*, 1 *Bradford*, 360, *and cases there cited*).

THE SURROGATE.—The decedent died without leaving issue, and his will is contested by a half-sister and several nieces and nephews. In the year 1845 Mr. Engle executed a will, wherein, after providing for his wife, he gave several legacies, from one to five hundred dollars, among his relations and connections, and then devised the remainder of his estate in trust for the establishment of a free infant school.

The will now propounded for proof, and which was executed the day of his death, gives to his wife's sister the use of his dwelling-house and furniture, and to several relatives of his wife, $3500; to the Society for the Relief of Indigent Females, $2500; to the Greene Street Methodist Church, $500, for the benefit of the poor; and the residue of his estate, except a house and lot on Broadway reserved for "future disposition," in trust during two lives, for the benefit of some fifteen relatives on his maternal side. At the expiration of the term the estate is to be divided among his heirs-at-law and

next of kin who shall then be living, in the same manner and in the same proportions as if the decedent had died intestate.

The decease of the testator's wife, and the advice he received as to the invalidity of the first will, probably led to the revocation of that instrument, and the execution of a new will. The contestation on the ground of incapacity has, I think, entirely failed. Although in his eighty-fourth year of age, and enfeebled by disease, his faculties seem to have been unimpaired. The witnesses who testified to the contrary indicate no facts which satisfactorily shake this conclusion; while, on the other hand, there is evidence of the highest character in favor of his testamentary capacity. Mr. Lord, who was called in for the purpose of receiving instructions to draft the will, on the 25th of February, 1854, had a long interview with him, in the course of which ample opportunity for judging of his mental vigor was afforded. We have the details of this conference in memoranda made by him at the time, from which it appears that the testator made a long statement of his property, and gave a list of his relatives and friends. The memorandum closes with these words : " His mind and memory seemed wholly unimpaired." Mr. Lord says he was " careful to look into his entire capacity to make a will," and " the result was I had no hesitation in going on and drawing the old man's will, whatever it might have been, being perfectly satisfied he possessed the requisite capacity." It is to be observed that Mr. Lord advised the testator against the scheme of the charity contained in the first will, thinking, " in consequence of the character of the proposed administration of it, that its object would not be well attained, and recommended him to dispose of his property among those having expectations from him, and those who had taken care of him." The matter was not then decided upon, and a future meeting appointed having failed, owing to Mr. Lord's sickness, other counsel was called in.

The will propounded for probate was drawn by William Lowerre, and executed by the testator March 15, 1854, the same day that he died. Mr. Lowerre had several interviews

with the testator in the course of preparing the instrument, at the first of which the decedent requested his opinion as to the validity of the charitable scheme proposed in the old will. He states that at the second interview he received his instructions orally from the testator in person, no one being present except Mr. Weaver, who occasionally communicated between them, while the counsel was engaged in making memoranda at the table. He says the testator named all the parties mentioned in the will and the amount of the legacies, of his own volition, and without suggestion, unless he may have been aided in remembering the names of some of his relatives. The interview lasted about two hours. At that time Mr. Lowerre understood the decedent as assenting to a suggestion he made that the property should be given absolutely to the beneficiaries without the intervention of a trust, and the will was prepared conformably to that idea. The following day Mr. Lowerre visited him again, and read the will. The decedent then objected to the bequests in an absolute form, and insisted upon a trust for two lives. The instrument being thus altered, was presented to him the ensuing day for execution. It was read over to the deceased, deliberately, paragraph by paragraph, and as each section was read, he was asked if he understood it, and if it was correct. He assented to each one except the third and fourth, which, from some misapprehension of the draftsman, had not been drawn in conformity to the original instructions. After the reading, John Shepard, who was present, stated that his name had been omitted among the relatives. Mr. Lowerre thought not, but it turning out on examination that his name was omitted, the testator was asked as to his intention, and he replied that Shepard should have an equal share. The will was then duly executed. These circumstances show origination of the bequests with the testator himself, mental activity, freedom, and determination of volition, and though there may have been suggestion, there is not a trace of improper dealing or undue influence. It may be as well to observe that the day the will was executed, the testator was

up and walking about his room. In the morning he requested Mr. Summers to have his bank book written up. This having been done, and the book returned to him, he went over all the checks one by one, and tested the accuracy of his account. After the will was signed he took his tea, and " conversed as sensibly as ever." He died half past eleven that night.

It seems to me that the only ground upon which the probate can be contested with any degree of plausibility, is the omission of the name of his half-sister, Mrs. McLean, among the legatees. If his memory was good, the omission was intentional or accidental. The mistake with regard to Shepard may perhaps raise a doubt whether similar errors might not have occurred in respect to other relatives. But as Shepard's name appeared in another portion of the will, and even the accurate draftsman thought it had a place in the residuary clause, it is not clear that the omission was attributable to a loss of memory. Where there was so much general activity of mind and memory in other respects, it requires something more than mere conjecture to presume a failure of memory in regard to parties who think they ought to have had a place in the will. It is not unworthy of note, also, that the testator's half-sister lived at a distance, and there is no other evidence of intercourse between them than a few letters, which are more profuse in expressions of affection than of any other substantial token. Nor is it to be forgotten that the Broadway property, a very valuable portion of his estate, is excepted from the operation of the will, and his sister not only inherits a portion there, but at the expiration of the trust estate as to the other property, her descendants will take a share in the residue in remainder, which by the terms of the devise will pass to his heirs-at-law and next of kin then living in the same manner as if he had died intestate. In view of the very satisfactory evidence as to the testator's capacity, it is not for me to say that he did not esteem the interest which his sister and her children would take under these provisions, adequate, and that he omitted

her name from forgetfulness or accident. But even on the latter hypothesis, no court would be justified in setting aside the will, for that must be the effect of attempting to rectify this supposed error. We cannot insert anything in the instrument; that must stand as it now is, or else the entire instrument must fall. The jurisdiction of the Surrogate in respect to the correction of mistakes is by the necessary operation of the Statute of Wills merely negative, and limited to refusing probate to a will or part of a will. (*Burger* vs. *Hill*, 1 *Brad. R.*, 374). I do not mean to say that a will cannot be refused probate when it is clearly established that omissions have been made which, as the will stands, defeat entirely the testator's intention. It will be time enough to consider that proposition when a case arises calling for it. But it would seem to be quite obvious that an instrument which so far as it goes is conformable to the decedent's wishes, cannot be defeated because there may be grounds for suspecting a minor casual omission. Under all the circumstances I have no hesitation in pronouncing for the will, and it must be admitted to probate accordingly.