## LEE a. DILL.

*Supreme Court, Fifth District ; General Term, October,* 1860.

### WILL.—UNDER INFLUENCE.

Before a will, the execution of which was obtained from the testator by the party
claiming under it, under circumstances indicating undue influence, can be ad-
mitted to probate, it must appear affirmatively that it was made by the tes-
tator when he had intelligence to comprehend its provisions, and independence
to adopt or reject them.

If the provisions of a will executed by an old and feeble man, differ from his pre-
viously expressed intentions, and differ in favor of those who stood in confi-
dential relations with him, it is evidence of fraud and undue influence, which
must be overcome by the most satisfactory testimony that the testator under-
stood its provisions, and acted freely.

Appeal from an order made by the surrogate of the county
of Onondaga, admitting to probate the will of the late Samuel
Dill.

The facts in the case are stated in the opinion of the court.

*Fuller & Barrett,* and *David Pratt* and *Charles B. Sedg-*
*wick,* for the appellant.

*Finlay M. King, John P. Hulbert,* and *Amasa J. Parker,*
for the respondents.

By THE COURT.*—MORGAN, J.—Samuel Dill, the testator, was
ninety years of age when he died, and he made his will the
same year, by which he divided the bulk of his property,
amounting to some forty or fifty thousand dollars, between his
two children, Robert L., the respondent, and Cornelia A., the
appellant.   He gave Robert L. the largest share, and made him
the executor, and also a trustee to manage the share devised to
Cornelia A. for the benefit of herself and children.

---

* Present, W. F. ALLEN, P. J., and MORGAN and MULLEN, JJ.

He was a man of intemperate habits, and blind, although he retained his mental faculties in a remarkable degree up to the time of his decease.

For a few years previous to his death, he intrusted the management of his affairs almost entirely to his son Robert L., who lived in his family, and obtained his confidence. The daughter, Cornelia A., had left the village against her father's wishes, and had gone to reside with her husband in a distant village.

There is evidence tending to show that the testator intended to divide his estate equally between his son and daughter; and there is no evidence, except what is furnished by the will itself, that he ever changed his mind, except to recompense his son in taking charge of him and his property after he himself became unable to attend to his own affairs.

There are also circumstances to create a suspicion that after Cornelia A. left Camillus and went to Newark, relatives of Robert L. Dill's family took some pains to create a state of alienation between the testator and daughter; but I do not think there was sufficient cause to enlist his indignation against her, or that the old gentleman was influenced by any hostile feelings towards her in making his will. He still declared his intention, so far as he has spoken in the evidence, to make his son and daughter equal in the distribution of his bounty.

We cannot doubt, upon the evidence, but that the testator was capable of making a will, when the will in question was executed; nor do we understand that it is claimed by the appellant that he was not competent. On the contrary, she attacks the will because she alleges that it was produced and executed by means of fraud and undue influence.

Upon such a question, it is a matter of considerable importance to examine the condition of the testator's mind, as well as the means used to procure him to make a particular disposition of his estate.

When we consider that the testator was ninety years old, that he was dependent upon his son, Robert L., to manage his business, was blind, and occasionally excited by the intemperate use of liquor, we cannot regard him as in that state of independence where he could easily withstand the importunities of those who had acquired his confidence, to obtain his signature to a paper, which in his earlier days, he might have resisted and rejected.

We are not informed, what were the provisions of his prior wills. It would have been a strong circumstance to support the will in question, if it had been shown that the main features of it were consistent with the provisions of his prior wills. So far as we know of his well-formed intentions, he designed to make his son and daughter equal in the division of his estate. He had a right to change those intentions, and give his son not only the greatest bulk of his property, but to make him trustee, to receive and manage what he intended for his daughter and her children; but he was blind, and could not read the provisions of the will in question. It must be shown in some way, therefore, that he knew the contents of the will, and was not imposed upon. (*Jarm.*, 47.)

It was not read to him in the presence of the witnesses, nor did he ever explain its provisions to any of his friends, so that we can see that he knew what its particular provisions were.

The draftsman, who was rather the agent of the son to procure a particular will, than the unprejudiced adviser of the old gentleman, says that he read the will over to him after it was engrossed; but he does not give such a history of the transaction as to satisfy us that he himself understood it, much less that the old gentleman understood it. It is said that it was drawn from the directions given by the old gentleman; but the evidence shows that the will was copied from a draft of a will, with slight variations, which was got at by the aid of one Henry Field, a short time previous. Mr. Field, a nephew of the old gentleman, was employed by him to make an inventory of his property, and assisted in "getting out the figures for him to draw his will." Robert L. requested Mr. Field to help in the figures, and thought he ought to be figured $9,000 better than his sister Cornelia, among other things, to cover some losses in a former speculation, in which he alleged his sister should bear a share; and the draft made on this occasion was handed over to Mr. Filly, and from this draft the will in question was finally drawn, with slight variations only.

It is, therefore, proper that we should examine into the testator, and the circumstances of the case at that time. The books were in Robert's hands; Robert gave Field the figures, or dates to make the figures, and the whole of the data to figure from; and he desired Field to talk with his father, and satisfy

him that he ought to have $9,000 more than his sister. Some of the provisions were copied from an old will, and were furnished by Robert L. Field, who was there about two weeks, off and on, in making out this draft. He says it was hard work for the old gentleman to understand some of the provisions. He did not understand Robert's figures readily, and finally, when he got troubled, referred it to Field and Robert, and enjoined them to fix it up right and do right.

He placed confidence in them to make it out right, rather than in his own judgment. Possibly he understood fully what the will contained; but under the circumstances of the case, I think the burden of proof is cast upon the respondent to show it. There may be good reasons which the old gentleman had to charge his daughter with a portion of the loss on the steam-mill speculation; but the case fails to show a clear statement of them. The will is ingeniously drawn to cover future advances to Robert L., so that if the old gentleman had lived long enough, and his hostility to his son-in-law, William H. Lee, and his daughter, had become sufficiently excited, his advances to his son might have swallowed up the entire estate.

Who is there to explain why this provision was inserted ? The old gentleman may have fully understood it, but the case does not show it.

Before a will thus obtained can be admitted to probate, it must appear affirmatively that it was made by the testator, when he had intelligence to comprehend its provisions, and the independence to adopt or reject them. If it be admitted in this case that Mr. Dill had both, there still remains the difficulty, viz.: that instead of canvassing the various provisions of the will in his own mind, until he understood them,—instead of mastering the figures which perplexed him, he yielded to those who had an interest in misleading him, and trusted to them to do right. At his age, and in his condition, it was easier to trust them than go through the mental labor of ascertaining the truth of the matter for himself. And now we think his son, who is so much benefited by the unequal provisions of this will, must satisfy the court and a jury that he did not abuse the confidence which the old gentleman reposed in him; but that he fixed it right in accordance with the known wishes and intention of his father.

In Creely *a.* Ostrander (3 *Bradf.*, 107), the will was read over to the deceased, by Mr. Lawrence (a counsellor of this court, who was employed to draw it), deliberately, paragraph by paragraph, and as each section was read, he was asked if he understood it, and if it was correct. There was not a trace of improper dealing or undue influence; and although the testator was eighty-four years of age, and enfeebled by disease, the surrogate very properly pronounced in favor of the will.

In Moore *a.* Moore (2 *Bradf.*, 261), the surrogate admitted the will to probate, although the testatrix was eighty-four years of age when it was made. There was some evidence of a failure of mental power, but it was affirmatively shown that the testatrix acted with intelligence, and fully understood the effects of what she was doing, and that the provisions of her will were in accordance with her intentions expressed at other periods.

In the absence of evidence, the court will not presume that the testator has been imposed upon by those who stand in confidential relations to the decedent.

But if the provisions of a will executed by an old man differs from his previously expressed intentions, and if it is made in favor of those who stand in confidential relations with the deceased, there is evidence, and we think a violent presumption, of fraud and undue influence; and that it must be overcome by the most satisfactory testimony, that the testator fully understood its provisions, and acted freely and voluntarily in the final disposition of his estate. It must be his will, and not the will of those who are in a position to deceive and mislead him. In case of old age, when blindness has prevented the testator from reading the provisions of a will for himself, it should be made to appear that the will was read over to him carefully, paragraph by paragraph, and that he not only comprehended, but assented to its various provisions. (Mowry *a.* Silber, 2 *Bradf.*, 133; Crispell *a.* Dubois, 4 *Barb.*, 393; 16 *Ib.*, 198; 30 *Ib.*, 134; 1 *Jarm.*, 40–47.)

As we understand this case, the respondents are required to remove all grounds for suspecting that the will was procured by improper means, and unfair practices. While we think the testator was competent to make a will, the circumstances under which the will in question was procured, are such, that it must

be made to appear that the decedent was fairly apprised of its provisions and its effects, and fully understood them, before it can be admitted to probate, as a valid will. There is reason to fear that many people are induced to make wills, by those who are in a position to deceive and mislead them, which do great injustice to other members of the same family, and which ought not to be sanctioned by the courts. It is often difficult, if not impossible, to trace out the unfair means which are used to procure them.

We think the law, if faithfully and rigorously maintained, is sufficient to frustrate the fraud in a majority of such cases. That requires the most satisfactory proof, that the decedent, who is old and infirm, should be free to choose upon whom he will bestow his bounty. To exercise this freedom, we think it should always be shown that the decedent was in an independent position, and entirely removed from the importunities of those who are named as his principal beneficiaries, to the exclusion, or partial exclusion of others who have an equal claim upon his bounty; and we think that it should appear that the decedent in such a case, was fully informed, or fully understood what he was about, and what would be the effect of the various provisions which are put into his will. It should not be procured by one or two members of the family, while the other members were beyond the paternal roof, and entirely ignorant of what was being done in their absence.

We do not say that all the members of the family should be sent for and consulted; but we do say, that in their absence, the decedent should have the benefit and advantage of some counsellor or friend, who stands in no doubtful relation to the family, and with whom the decedent could freely express his wishes and intentions, and upon whom he could rely for aid and assistance in carrying his intentions into his will. We speak of that class of wills, where certain members of the family who have the opportunity, succeed in obtaining an advantage over others, equally worthy to share in the division of the estate. Where all are fairly and equitably comprehended in the bounty of the testator, there is no occasion for imputing fraud or undue influence to any one.

There is no doubt but an old man of eighty, ninety, or even one hundred years of age, may make a valid will, giving all, or

the greatest portion of his large estate to one member of the family. If he is free to act as he pleases, and fully comprehends what he is doing, his will must stand. (5 *Johns. Ch.*, 158.) But the courts ought, we think, to be careful and vigilant in such a case, to require the most undoubted evidence that he acted freely, and that he fully understood himself.

While we would not undertake to examine too critically his reasons for such an act of favoritism, we ought to require proof that he did what he did because he was free, and could do as he pleased with his property, and fully comprehended the effect of what he was doing.

The result is, that the order of the surrogate must be reversed, and an issue awarded to try the question at the next Circuit Court, the costs of the appellant to abide the event. (2 *Rev. Stat.*, 66, § 57 *Laws of* 1847, ch. 280, § 1.)