KINGS COUNTY.—HON. W. L. LIVINGSTON, SURROGATE.—
July, 1880.

NEIHEISEL v. TOERGE.

*In the matter of the probate of the will of* ELIZABETH
STARK.

Where the witnesses to a will differ in their testimony as to the mode of its execution, and one of the witnesses is the lawyer who drew the will and attended to its execution, his evidence will have greater weight than that of the other witness, who is unfamiliar with the execution of wills.

The positive testimony of a witness to the occurrence of a fact is entitled to more weight than the negative testimony of another witness to the non-occurrence of the fact.

Facts that do not constitute undue influence, considered.

APPLICATION for the probate of the will of Elizabeth Stark. The facts appear sufficiently in the opinion.

NEIHEISEL *v.* TOERGE.

N. H. CLEMENT *and* A. SIMIS, 'JR., *for the will.*

J. ESCHWEGE, *guardian ad litem, for contestant.*

THE SURROGATE.—The probate of this will is opposed on three grounds. It is claimed :

1st. That it was not properly executed.

2d. That it was procured through undue influence.

3d. That it does not express the intentions of the testatrix.

Mr. Simis and Mr. Daab were the two attesting witnesses, and they differ as to some of the facts.

According to Mr. Daab's version, he went to Mrs. Stark's house for the purpose of witnessing her will, and got there before Mr. Simis, the other attesting witness. When Mr. Simis arrived, he and Mrs. Stark went into the front room, Daab remaining in the back room ; Simis and Mrs. Stark were in the front room some ten or fifteen minutes when Daab was called in. The will had been signed by Mrs. Stark before Daab went into the front room. When he came in, Mrs. Stark said that she was glad to have him witness the will. Mrs. Stark was sitting at the table, and the will was lying on it ; he could see Mrs. Stark's name, which I understand to mean her signature. Mr. Simis asked Mrs. Stark if the signature to the will was her name, and she answered yes ; Mrs. Stark told Daab to sign his name as a witness to the will, and he and Simis both signed the will as witnesses in the presence of Mrs. Stark and of each other.

Mr. Simis's account is substantially as follows : That he went to Mrs. Stark's house by appointment, to attend to the execution of her will ; that when he arrived at the house, Mrs. Stark took him into the front room ; that he

then read the will to her and she expressed herself satisfied with it; that Mr. Daab was then called into the front room; that after Daab had come into the front room he, Simis, asked Mrs. Stark to sign the will; that she did so; that he then asked her in German if that was her last testament, that word in German meaning both a will and testament; that she answered yes; that he also asked her after she had signed the will if she acknowledged the signature as her own, to which she replied yes; that he asked her if she desired him and Daab to sign the will as witnesses, to which she said yes; that thereupon he and Daab both signed the will in the presence of each other, and that Mrs. Stark thanked Mr. Daab for coming over and witnessing the will, which was left in the possession of Mrs. Stark. Mr. Simis says that he is positive that he asked Mrs. Stark if that was her last testament; and also that he asked her if she requested him and Daab to witness the will.

Mr. Simis was a lawyer, whose business it was to see that this will was properly executed; he was familiar with the formalities required, and he is far more likely to have remembered accurately what was said and done on that occasion than Mr. Daab, who knew nothing about the execution of wills. (Orser v. Orser, 24 N. Y., 53; Weir v. Fitzgerald, 2 Bradf., 71.) Moreover, all other things being equal, the testimony of a witness who testifies positively that a certain fact occurred is, generally speaking, entitled to more weight than the evidence of another witness who swears that the fact did not occur; for it is far more probable that the latter has forgotten the occurrence than that it should be distinctly impressed on the mind of the former if it never took place.

(Tarrant *v.* Ware, 25 *N. Y.*, 425.)   The attestation clause also corroborated Mr. Simis in those particulars as to which he and Mr. Daab differ.   I find that the will was properly executed.

It is not even suggested that Mrs. Stark did not have full testamentary capacity at the time of executing the will, in May, 1879.

Dr. Stub, who had attended her professionally for several years, says that she had fixed purposes and a will of her own; that he considered her a good business woman.   And Mrs. Roth, who had known her twenty-five years, says that she went to see her in November, 1879, to ask her advice about some business matters, because she was a very smart woman.   But, it is claimed, on behalf of John Neiheisel, who is Mrs. Stark's son by her first marriage, that the will was procured through the undue influence of Mr. Toerge and of his wife, who is the daughter of Mrs. Stark by her second marriage.

There is no evidence of any request or suggestion made, or of any deception, fraud or other improper means practiced by either Toerge or his wife to induce the testatrix to dispose of her property as she has.   In fact, no evidence of anything said or done by either, from which anything like undue influence could be inferred, except the declarations of the testatrix on one or two occasions, when, for instance, in December, 1876 or 1877, she told Mrs. Bayer "that she would do a great deal for Mrs. Neiheisel, but she never dared to do it; that she was afraid of the others ; but the very moment that she could come to the point that she should make her last will and testament she would take care of her just as well as of any other of her children."   And

again, when in April, 1879, she said to Mrs. Neiheisel that she had trouble with her son-in-law Nick ; that he did not wish her to leave her husband half, but she could not help it, because John was her child as well as Lena.

But these declarations alone are not competent evidence to prove any acts on the part of either Mr. Toerge or his wife amounting to undue influence, although, if any such acts had been proved, the declarations would be evidence to show the operation they had on Mrs. Stark's mind. (Cudney v. Cudney, 68 *N. Y.*, 148, 152 ; Horn v. Pullman, 72 *N. Y.*, 269, 278.)    Together with other declarations of the testatrix, they were also admissible to prove the condition of her mind.    (Waterman v. Whitney, 11 *N. Y.*, 157.)

This declaration on the part of Mrs. Stark, that she would do a great deal for Mrs. Neiheisel, but she never dared to, is inconsistent with other declarations made by her in regard to what she intended to do for Mrs. Neiheisel, and with what she actually did for her.    For instance, shortly before she made the declaration to Mrs. Bayer, she said to Mrs. Neiheisel, in the presence of Mrs. Bayer, that she would rent a house for her where she could take care of her husband, who was a lunatic, and would put everything in the house that they needed ; and after Mrs. Neiheisel had left she avowed to Mrs. Bayer her intention to do all in her power for Mrs. Neiheisel, because she was such a good little woman, &c. And she did after that give her $800 a year, and paid the taxes and premiums of insurance on Mr. Neiheisel's house in Bergen street.    She also said to Mrs. Scheiler that she was going to buy a nice place in Jersey, and

they would all live together. Mr. and Mrs. Neiheisel, and Mr. and Mrs. Toerge and herself, they would all live together; and there is no evidence of anything said or done by either Toerge or his wife that would justify Mrs. Stark's remark to Mrs. Bayer.

Before making her will she told Mrs. Roth, an old friend of hers, that as there were no children on the other side, her daughter would get all, and that she would give her son $100 a month as long as he lived. Mr. Simis called upon her in May, 1879, to get her instructions in relation to drawing her will. He saw her alone, and she showed him a will which had been executed by her. She said that she desired to change it; that she wanted to give her son three houses as soon as he was healthy again, but as long as he remained sick she would give him $100 per month, the same as in the last three or four years, and she would give her daughter the other houses.

He made the draft of a will, and called on her with it; he saw her again alone; she desired to make some alterations in the draft will, and said to him : "I have several friends to whom I want to make a trifling present which I have forgotten," and gave him the names of those friends. He made another draft, and called upon her again with this second draft. They were alone, and she said to him that she did not think she would leave Mrs. Neiheisel anything, because Mr. Neiheisel, her son John, owned a house on Bergen street, or his wife did, on which she, Mrs. Stark, was paying the taxes, and she thought, on John's death, that would be his wife's property, and would be sufficient, as it was bought with Mr. and Mrs. Stark's money. Another reason was that she

had had some trouble with Mrs. Neiheisel in her own house, about a servant girl, and that Mrs. Neiheisel said that either she or Mrs. Stark must get out of the house, and that ever since then she did not think as much of Mrs. Neiheisel as before ; but she had thought the matter over, and she thought she ought to leave Mrs. Neiheisel something, and therefore she wanted to leave her $4,000, in the event of John Neiheisel's death, that she should then receive the $4,000 in cash ; that she had paid to Mrs. Neiheisel $100 a month for the support of herself and husband, and had paid the taxes and insurance on the Bergen street property, and the doctor's bills, and she thought she was doing quite well for the Neiheisels at that time.  At this interview she repeated that if her son John got well, he was to have those three houses, and until he got well he was to have this $100 a month.  She said that the children of Mr. and Mrs. Toerge should have the benefit of the property.  She wanted Mr. Simis to fix it in this way ; that they should have the interest of the property as long as they lived ; she wanted to keep the property intact among the two children, and when they died, then the children of her children should have the benefit of it ; that her son John, if he ever got well, was to have those three houses for life, and in the event of his death, she wanted the property to go over to her daughter, Mrs. Toerge, and in case John did not get well, and died, she wanted Mrs. Neiheisel to get $4,000 in money ; she also said that she wanted her daughter to have her pictures and books and furniture, and all her personal property.  Nothing was said about money in bank or on mortgage, only that everything else that she had she wanted to go to her

daughter. She said further that she had given money and clothes to some of the parties to whom she wanted to leave small amounts, besides Mrs. Neiheisel, and paid their doctors' bills. In connection with the conversation about the Neiheisels, she said that Mr. Neiheisel had got $4,000 in cash several years before.

Some time in the year 1879, after the execution of the will, she said to Mr. Koch that there never was a will made but what would disappoint somebody; that she did not think that her son would live very long, and if she left a large sum of money to Mrs. Neiheisel, she being young and handsome, it might be means of her marrying again; that her first care should be to the children; that the Neiheisels had no children to care for, and that Mrs. Neiheisel's family were well off; that if John Neiheisel recovered, the two houses in Myrtle avenue would be his, and if he did not get well, that his wife was to receive a certain amount of money.

To Dr. Stub, in November, 1879, after referring to her conviction that she could not live long, she said that she had made her will; he expressed the hope that she had not forgotten to provide for her son, John Neiheisel, and she answered that she had not forgotten him; that she had done as much for him as she thought she ought to under the circumstances; that she had left $150,000 to her daughter, Mrs. Toerge, during her life; that she had left nothing to Mr. Toerge, because he had enough; that he should not handle the money for his own benefit; that she had arranged it in such a way that the money should go to the children afterward; that, besides that, she had left a few legacies. Referring to the Neiheisels, she said that she had remembered her son as well as his wife; that

he, according to her ideas, had no claim upon her what ever; that all he was to get he did get when his father died; and in consideration of Mrs. Neiheisel having been such an excellent wife to him, she had remembered her in her will.

Some time in 1879, after speaking to Mrs. Griffin about all she had done for John, she said that Mr. Stark had given him all his father's property; that he had done so much for him; that Lillie had the best right to her father's property; that it was her father's property, and she had the best right to it.

Mrs. Bauer, an old friend, who had known her from childhood, testified that, in October, 1879, she had a conversation with her in which she spoke of the will that she had made; that she (Mrs. Stark) had lost all hope of ever recovering, and said that she had made her testament; that she had heard from medical authorities that her sick son would never recover, and that she had put down for him every month $100 just as long as he would live, and about $4,000 for her daughter-in-law, Mrs. Neiheisel; but that, if her son had children, she would have made her will in quite a different way; that she had left some legacies to some poor people in her old home in Germany, and she said she had an older sister than she was, to whom she had given something every year, and that the same would be given to her by means of Mr. Toerge; and the rest of her property she had given altogether to her daughter, because she had children; and she stated further it would be about $150,000; that the father of her daughter was the man who had made the money, and she was not bound to give her money to other people.

It is quite true, that, judging from other declarations made by her, it appears that, up to within a short time previous to making her last will, she intended to divide her property equally between her son and daughter. In 1874, when her son John was of sound mind, and her daughter Emma was living, she made a will in which the three children were treated alike; and she repeatedly declared to different witnesses and at different times, long after Mr. Neiheisel became insane, and down to April, 1879, that her son was entitled to share equally with Mrs. Toerge, because his father's property had been the foundation on which Mrs. Toerge's father had built his fortune. And after the death of her daughter Emma, she said that she would make another will, dividing her property equally between her son and Mrs. Toerge. The only witness, so far as I recollect, who testifies to contrary declarations on the part of Mrs. Stark, previous to the instructions given by her to Mr. Simis, in regard to the present will, is Mrs. Roth. A change of testamentary intention, as bearing upon the allegation of undue influence in procuring a will, is sometimes an important circumstance. But its force depends mainly upon its connection with associated facts. (Horn v. Pullman, 72 N. Y., 269, 276.) In this case there is no evidence that Mrs. Stark's mind was changed through any undue influence on the part of Mr. or Mrs. Toerge; it may well be that, in considering the matter, the reasons which she gave to Mr. Simis, Dr. Stub and others, for making her will as she did, presented themselves to her mind and controlled the disposition of her property; even if those reasons had been suggested to her by either Mr. Toerge or his wife, of which there is

no evidence, that, of itself, would be no ground for refusing to admit this will to probate. (Tunison v. Tunison, 4 *Bradf.*, 138, 149; Creely v. Ostrander, 3 *Id.*, 107, 112; Newhouse v. Godwin, 17 *Barb.*, 236, 259.)

Mrs. Neiheisel testified that after Mrs. Stark had told her, in April, 1879, that she had had trouble with Mr. Toerge because he did not want her to leave half of her property to her son, she seldom had the opportunity of being alone for any length of time with Mrs. Stark; that Mrs. Toerge was constantly present. Considering that Mrs. Stark was an invalid, that the will was executed in May, 1879, and that she died of consumption in the beginning of January, 1880, it was only natural that Mrs. Toerge should desire to be as much as possible with her mother, not only for Mrs. Toerge's own gratification, but to comfort and cheer Mrs. Stark as much as she could during the few months that Mrs. Stark had to live.

Not the slightest effort seems to have been made to prevent Mrs. Neiheisel from seeing Mrs. Stark when and as often as she pleased, and perhaps the best proof that Mrs. Toerge was not more constantly with her mother than might be expected under the circumstances is that Mrs. Neiheisel herself did not think so at the time, but only "when she came to think back." When the thought first occurred to her is not very clear, and it appears that at least on one occasion, in December, 1879, Mrs. Toerge went down to Fulton street and left Mrs. Neiheisel substantially alone with Mrs. Stark for half or three-quarters of an hour, the only other person present being Mrs. Toerge's little boy, seven years old. Mrs. Neiheisel says that Mrs. Stark was asleep when Mrs.

Toerge left, and did not wake up until she returned. But still, if Mrs. Toerge had determined never to leave Mrs. Stark and Mrs. Neiheisel together alone, she scarcely would have acted as she did on that occasion, for Mrs. Stark might have waked within a few minutes after she had left.

But it will be noticed that all this occurred after the execution of the will, for Mrs. Neiheisel was alone with Mrs. Stark in April, 1879, and as Mrs. Neiheisel lived in New Jersey, and came up to see Mrs. Stark about every three weeks, Mrs. Neiheisel could not have paid Mrs. Stark more than one visit after April, 1879, if any at all, before the execution of the will, which took place May 15, 1879; while Mrs. Neiheisel does not pretend that she found any difficulty in being alone with Mrs. Stark at any time prior to May, 1879, during which time Mr. and Mrs. Toerge would have had far more reason to dread the influence of Mrs. Neiheisel's presence on Mrs. Stark, if they were trying to induce her to dispose of her property contrary to her feelings and wishes.

Mrs. Neiheisel's own conduct is quite inexplicable upon the theory that she noticed and was aware that Mr. and Mrs. Toerge were trying to influence Mrs. Stark to the injury of Mr. Neiheisel, for she does not seem to have made any effort to discover what the will was, although she knew that it had been executed, and she remained on intimate terms with the Toerges until the contest in relation to the will began, no change whatever appearing to take place in the relations existing between them.

Neither is the devise to Mrs. Toerge such as might be expected if it was procured by the undue influence of either herself or husband. With the exception of the

personal property, which is comparatively small, Mrs. Toerge only takes an estate for life in the real estate; and if, as is now claimed by the contestant, Mrs. Stark was so much under the control and influence of Mr. and Mrs. Toerge as to be deprived of the freedom of her will, it is certainly singular, to say the least, that the devise to Mrs. Toerge should not have been in fee.

It is unnecessary to pursue this subject further; the charge of undue influence is not sustained by the evidence.

Assuming that the legal construction of the will does not carry out Mrs. Stark's intentions as to the disposition of the real estate after Mrs. Toerge's life estate shall have ended, that is no reason for rejecting the will.

I have not been referred to any case which holds that doctrine, and I have not found any. It will be observed that the will does not dispose of the real estate contrary to Mrs. Stark's intentions. So far as it goes it conforms to her wishes. It is her will, but it simply makes no disposition at all of the fee in the land, and it would indeed be a curious result of omitting from a will a part of the testator's intentions if on that account his wishes expressed in the will must be disregarded. (Creely v. Ostrander, 3 *Bradf.*, 107, 114.)

It is claimed also that Mrs. Stark did not intend to give all her personal property absolutely to Mrs. Toerge, but only her furniture, jewelry and "personal effects;" because, in giving her instructions to Mr. Simis in German the word "eigenthum" was used. The strict technical meaning of that word may be "personal effects," but Mr. Simis, who was born in Germany and speaks German fluently, seems to understand it as in-

cluding all kinds of "personal property." It appears
by the stenographer's minutes that it was so translated
by the court interpreter; and it is highly probable from
Mr. Simis's testimony that it was used on this occasion
by Mrs. Stark in its more enlarged and comprehensive
meaning, just as Mr. Simis used it, the inquiry being as
to what disposition Mrs. Stark desired to make of all her
other property besides the real estate. The will was also
read to her in English before it was executed. It must
be held on the evidence to correctly express her intention
in regard to the disposition of her personal property.

A decree admitting the will to probate may be entered
on two days' notice.