Rollins, S.
The instrument that has given rise to the controversy now to. be determined was executed by Anna Clausmann, the decedent, on March 28, 1885, eight or ten hours before she died. Two days later it was propounded for probate by John Severs, whom it names as its executor, and to whom it undertakes to bequeath nearly all the property left by its maker at her decease.
In his petition for probate Severs alleged, upon information and belief, that Mrs. Clausmann had left her surviving no child or children, no issue of any deceased child or children, no father, mother, brother or sister, and no issue of any deceased brother or sister. He further alleged that he had no knowledge or information as to the existence of any person or persons who sustained to Mrs. Clausmann the relation of next of kin. For reasons that will hereafter be disclosed, I am compelled to believe that, in making these allegations, the proponent was' disingenuous, if, indeed, he is not fairly open to a graver imputation.
The citation issued pursuant to his petition was personally served upon the Public Administrator and upon him alone. On May 21, 1885, no one opposing, the paper propounded was admitted to probate. In October of that year there was filed with the Surrogate, a petition praying that such probate be re- *330 voted. This proceeding for revocation was instituted by certain of decedent’s next of kin — to wit, two nephews living in the State of Michigan, and two nieces, one living in that State, and the other in the State of New York. All four of these petitioners are children of Mrs. Effie Cox, a deceased sister of Mrs. Clausmann, who died at Lummisville, in Wayne County of this State, in June, 1884.
The decedent, at the time she executed the will which is now sought to be disestablished, was more than eighty years old. She lived in a tenement consisting of two rooms on the street floor of a building in West Thirty-sixth street, in this city. These premises she had occupied for several years, hiring them from the proponent Severs, and paying him rent therefore at the rate of $6 per month. Her only hoxisehold associate was one Ellen McCale, a woman but ten years younger than herself, who seems to have assisted . in domestic affairs, and after the decedent fell ill to have acted as her nurse and attendant. The building which was in part tenanted by Mrs. Clausmann stood upon the rear of a lot of land occupied in front by the residence of John Severs.
On March 28, 1885, the day the alleged will was executed, the decedent was very ill and weak. Dr. Adolph Rupp, the physician who attended her, says that when he saw her in the afternoon of that day, not far from the time when she is claimed to have given instructions for the making of her will, he knew that her death was close at hand, and announced to the proponent and his wife that there was no hope of her recovery.
It was while she was in this moribund condition that, according to the testimony of Mrs. Severs; she asked the proponent to bring to her sick room a notary who could make a will, and said, addressing Severs, “ I am going to make a will now to you.” To this Severs replied: “ I guess you will be all right again.” “ Oh, no,” repeated the decedent. “ I will make my will and I will be sure you must bury me; you must do it; you must promise me.”
Thereupon Severs went in search of a notary public, and at some hour between three and five in the afternoon returned to the decedent’s apartment with Adam Henz, whom he had found at his place of business somewhere in the neighborhood. The story of what then ensued is told by Mrs. Severs as follows: “ He ” (the notary) “ asked if she (the decedent) had a husband and she told him she had had two husbands but both were dead. He asked her if she had any children and she said no; then he asked her what she will do, she said she will leave it to Mr. Severs — $200 for Mrs. McCale, and what was left for him ” (Severs).
Q. “Then the will was drawn out?” A. “Yes, he” (the notary) “ sat down and drew it.” •
*331 The testimony of Henz does not conflict with that of Mrs. Severs, but contains this additional statement, that in response to a question as to the nature of her property, the decedent said that “ all she had was money in bank and a little furniture.” * * ’ .
These accounts of what took place just before the will was written are of grave importance, not simply as showing what was said, but as showing also what was not said between the notary and the decedent at the only time when the latter is claimed to have given instructions for the preparation of her will. She seems to have been asked whether she had a husband, and whether she had children. She was not questioned as to the existence of any other relatives, and for aught that she said or that was known to the notary and the proponent she might have had a dozen brothers and sisters, with nephews, nieces and cousins by the score. She was asked, if Mrs. Severs is to be credited, respecting the nature of her property, but no inquiry or disclosure was made in regard to its value.
These omissions were serious. The proponent should not, in view of the circumstances disclosed by the evidence, have allowed the decedent to make a will under which he would be substantially the sole beneficiary until her attention had been expressly called to the nature, extent and value of her property, and to the question whether or not any persons existed who would naturally be the objects of her bounty. In addition to the “ money in bank ” and the “ little furniture ” which, according to the testimony of Henz, was declared by Mrs. Clausmann to constitute her whole estate, there was found upon her person after her death $55 in money. And hidden in the clothing of her bed, not only the bank books of which she had spoken, showing deposits to her credit of over $3,000, but the sum of $875 in cash.
The only persons who were about her when she is claimed to have made testamentary disposition of this property were the subscribing witnesses, the legatee Ellen McCale and Mr. and Mrs. Severs. One of those subscribing witnesses was the notary Henz, the other was John Schneir, a brother-in-law of Severs. Severs and Mrs. McCale are the only persons named as beneficiaries in the will. Mrs. McCale is given $200, and Severs the entire residue.
As to the relations that existed between the decedent and her kindred, the evidence is meagre and somewhat conflicting.
There are witnesses who tell of sweeping declarations made by Mrs. Clausmann on divers occasions against her relatives generally, and other witnesses who testify as to other occasions when the old lady spoke of her nephews and nieces, and of one nephew in particular in terms of approval and affection, and expressed her intention of giving to them or him a share of her estate.
*332 It appears by tlie testimony of Mrs. Nancy Ciarte that about seven or eight years before the decedent’s death her sister, Mrs. Cox, the mother of these contestants, who was then a widow, visited the decedént and remained with her for about six months ; this sister then returned to her home at Lummisville, N. Y., and died there at the residence of her daughter, Mrs. Townsend, about ten months prior to the date of this will. Mrs. Clark further testifies that she was informed of the death of Mrs. Cox by a letter from Mrs. Townsend, and that she read that letter to Mrs. Clausmann. This testimony is very important when considered in connection with that of Mrs. Harriet Ground. Mrs. Ground took charge of Mrs. Clausmann’s body after her death, and discovered most of the property which is the subject of this controversy. She states that in the course of the search, which resulted in finding .the money and bank books to which I have referred, she saw several letters of which Severs afterwards took possession. She describes these letters as having been “ written to be sent away,” and says that they had decedent’s name at the bottom — “Anna Clausmann.” Severs was notified by the contestant’s counsel to produce the letters about which Mrs. Ground had thus testified. He subsequently did produce one letter, and only one, saying: “There is one letter left; there were a good many of them destroyed ; I kept them for six or seven months ; I thought it was all over.” He was then asked by his counsel: “ Who was that letter from ? ” And his reply was : “ From a sister in the West; she died a jmar before Mrs. Clausmann died.” The letter produced was subsequently proved to be in the handwriting of the decedent, and was put in evidence. It does not answer at all to Severs’ description. It is addressed to her “ dear niece,” meaning, as is revealed at its close, Mrs. Townsend, one of these petitioners ; and if it was written when it bears date (August 21, 1884), it tends to show that at that time, only seven months before her death, Mrs. Clausmann entertained kindly feelings towards her relatives.
In this review of the evidence I have purposely refrained from discussing any portion of it which proponent’s counsel criticises as unworthy of credence.
As I view this case, it is quite unnecessary for me to make up my mind whether Mrs. Ground’s report of the decedent’s mental and physical prostration on the day the alleged will was executed should be believed or disbelieved; or whether her statement that Severs sought to purchase her testimony, or his, that she tried to sell it to him, is the more consonant with truth.
On the undisputed facts the case of the proponents is very suspicious. It does not appear that during the decedent’s residence as a tenant in the house of the proponent, he or his family had conspicuously merited her gratitude or that they ex *333 pected or bad the slightest reason for expecting that she would or could reward, with such profuse liberality, the slight courtesies and kindnesses she had received at their hands. That Severs was greatly astonished when he learned how considerable a sum had been bequeathed to him by his tenant is shown by the testimony of Mrs. Ground and has not been disputed. There certainly was abundant cause for his astonishmént.
I am greatly inclined to think that when the decedent announced her purpose of leaving him all her property except $200, and subsequently gave directions for the preparation of a will which should effectuate that purpose, she did so chiefly, if not altogether, for the sake of securing for her dead body a decent burial. She seems to have been under a morbid apprehension that her remains might be deposited in Potter’s Field. This appears in what she said on three several occasions to Henry Sehneir and Mrs. Severs, two of the proponent’s witnesses, and to Henry Woodgate, who was called by the petitioners.
Says Sehneir: “ She said, ‘ My landlord is the nearest friend I have got, and he is the man who will bury me,’ otherwise she would be buried in Potter’s Field, and she felt bad about being buried in the Potter’s Field.”
Woodgate testified that not long before her death the decedent intimated a'wish that he (Woodgate) should bury her, and proposed to give him her money.
The contribution which Mrs. Severs makes to this theory has been stated already. She reports the decedent as saying to Severs: “I am going to make a will now to you; I will make my will, and I will be sure you must bury me; you must do it; you must promise me.-”
In this situation I am clear that Severs was called upon to make inquiry into the value of the dying woman’s estate, and to ascertain her relations with her kinsfolk before he busied himself in finding a notary, or consented to the execution of a will in his interest. In view of the facts and circumstances upon which I have commented, I have serious doubts both as regards the testable capacity of this decedent, and as regards her freedom from such influence as the law pronounces undue.
The words of Surrogate Bradford, in Mowry v. Silber (2 Brad., 133), seem to me as applicable to the present case as to the case in which they were uttered: “Nothing but the most clear and satisfactory proof of freedom from control, and self volition, could sustain such a will of such a testator. * * Under the circumstances here disclosed the ordinary presumptions flowing from the act of formal execution do not obtain, but the burden is thrown upon the party seeking to establish the testamentary act to show that all those precautions were taken and those explanations were had that were necessary to secure to the party the full, free and unbiased action of his impaired faculties.”
*334 See also Lee v. Dill (11 Abb. Pr., 214), which holds that in such a situation as the present, the proponent of a will is required' to remove all ground for suspecting that it was procured by improper means and unfair practices, and must make it clear to the court that the testator fully understood the nature and consequences of his testamentary act. And to similar effect see Baker v. Batt (2 Moore P. C., 317); Van Pelt v. Van Pelt (30 Barf., 134).
Sec. 2622 of the Code of Civil Procedure declares that “ before admitting a will to probate the surrogate must be satisfied of its genuineness and of the validity of its execution.”
Sec. 2652 provides that if in a proceeding for revocation of probate the surrogate decides that the will is “ not srtffieiently proved ” he must make a decree accordingly.
As it has not been established to my satisfaction that the paper here in controversy was executed by a free and capable testator, I must direct that the probate thereof be revoked.