*In re* STEWART'S WILL.

(*Surrogate's Court, Kings County.* May 26, 1890.)

WILLS—UNDUE INFLUENCE—EVIDENCE.

Seven years before his death, testator executed a will dividing his estate between his son and two daughters, with an annuity of $100 to his housekeeper; appointing his son and two grandsons executors. By a subsequent codicil the housekeeper's annuity was increased to $300. His son managed testator's business, and was highly esteemed by him. Three years later, testator, then 84 years old, was stricken down with paralysis, and his condition was such as to require great care from some one, which was given him by his housekeeper. By threatening to leave him, she so worked on testator's fears that he secretly married her. An attorney who was intimate with both testator and the housekeeper persuaded testator that his son had deceived him in some trivial business transaction, and testator became suspicious of him. After the marriage the treatment of the children by the attorney and the housekeeper was such that they rarely visited testator. Testator's son continued to transact some business for him; but the housekeeper and attorney dominated all testator's business affairs, and never permitted the son to see testator alone. *Held,* that a will executed without the knowledge of any of testator's children a few months after the marriage, and within 18 months of testa-

tor's death, by which he gave the housekeeper a one-fourth share in all his property, the two daughters each one-fourth, and by which he cut off his son with a life-interest in the other fourth, vesting the entire control of the estate in the attorney, would be set aside for undue influence.

On application for the probate of the last will and testament of James Stewart, deceased.

*Jas. R. Allaben,* ( *W. B. Mayben,* of counsel,) for proponent.    *D. W. Northrup,* ( *W. D. Veeder,* of counsel,) for contestants.

ABBOTT, Sur.    James Stewart died in September, 1888.    Had he lived until November, he would have been 86 years old.    He left surviving, his widow, Eleanor E. Stewart; one son, James C. Stewart, a married man of middle age, with a family of grown-up children; and two married daughters, Gilla Alma Gates and Lucretia A. Robinson, each with grown-up families.    On the 16th day of November, 1881, deceased made a will by which he divided his estate equally between his three children, with an annuity of $100 to Miss Ely, then his housekeeper, and afterwards his wife.    He executed a codicil to this will on the 21st day of February, 1884, which increased the annuity to Miss Ely from $100 to $300.    He appointed as executors of this will and codicil his son, James C. Stewart, and his grandsons, Charles Gates and Stewart A. Robinson.    At this time, testator's relations with his children and their families were affectionate and friendly, as the provisions of this will and codicil indicate.    His son, James C., managed the details of his business for him to his apparent satisfaction, and was trusted and highly esteemed by him.    In the spring of 1884, shortly after making this codicil, he was stricken down with paralysis, from which he partially recoved; but he never again was as strong, physically or mentally.    He was married four times.    His third wife died in 1879, and a few months after her death he employed Miss Ely, a maiden lady of 60 years, as his housekeeper, to whom he was secretly married on the 9th day of December, 1886.    James R. Allaben had been the attorney and intimate friend of testator for many years; but, after this sickness, he visited him more frequently.    He was also on intimate terms with Miss Ely, the housekeeper.    In June, 1886, a few months before testator's marriage, the proponent, Allaben, persuaded testator that his son had deceived him with reference to some trivial business transaction; and after this the testator became suspicious of his son, James C.    These events, to my mind, mark the beginning of the undue influences which wrought the changes in the testamentary dispositions of James Stewart which followed.    On the 12th day of March, 1887, he made another will, by which he evidently intended to divide his estate into four parts, although the language is somewhat ambiguous, giving to the widow and his three children one part each, except that, from the portion of Gilla Alma, $3,000 was taken, $1,000 of which was to be divided equally between the children of Lucretia, and $2,000 was added to the share of James C. Stewart.    The shares of Lucretia and James C. were then given in trust, the income to be paid to each quarterly.    He also gave $200 to a granddaughter, the eldest daughter of his son, James C., who had married against the wishes of her parents.    He appointed as executors of this will his wife, Eleanor E. Stewart, his son, James C. Stewart, his grandson, Stewart A. Robinson, and James R. Allaben, his lawyer.    He designated Allaben as the managing executor and sole trustee, and gave him control and custody of all the papers, books, and assets of the estate, and directed that no action should be binding unless approved by the said Allaben.    By a codicil to this will, executed on March 10, 1888, his son, James C. Stewart, was removed as executor; and by a subsequent codicil, executed on July 2, 1888, he transferred the $2,000 given to James C. from the share of Gilla Alma to this residuary estate.    This will and these codicils were made without the knowledge of his children.    The son, James C. Stewart, offered the will of 1881, and the codicil thereto, for probate; and the same day the

will of 1887, and the codicils thereto, were presented for probate by James R. Allaben, one of the executors named in the will. Eleanor E. Stewart, the widow, and one of the executors named in the will of 1887, objects to the probate of the will of 1881, and the codicil thereto, on the ground that they were superseded and revoked by the will of 1887, and the codicils thereto. James C. Stewart and his sisters object to the probate of the will of 1887, and codicils thereto, on the ground of lack of testamentary capacity, and that they were procured by the fraud, circumvention, and undue influence of the widow and James R. Allaben.

The contest in this matter was begun before my predecessor, and several hundred pages of testimony were taken before him, including the testimony of the subscribing witnesses; and I labor under the disadvantage of not having seen many of the witnesses, and of having lost the personal impression which is so valuable, oftentimes, to a judicial officer, in considering testimony. The trial was long drawn out, and the pages of testimony numbered thousands before its completion. Much of it was cumulative, and, when briefly epitomized, shows a family disruption, caused by the secret marriage with his housekeeper of a weak, parsimonious old man, somewhat addicted to the use of liquor, of decaying mental powers, who after his marriage changes his testamentary disposition towards his children to their prejudice and humiliation, through the covert machinations of his wife and legal adviser, who were unfriendly to his children. At the conclusion of the trial, it seemed to me that the evidence tended to prove that the testator probably had sufficient testamentary capacity to execute the last will and codicil, and that this objection could not prevail. My subsequent examination of the testimony confirms this view. I had the impression, however, that testator's mind was undoubtedly impaired to some extent, and was rendered feeble by paralysis and disease, and that, in executing the last will and codicils, undue influence had been brought to bear upon him by his wife and James R. Allaben, so as to prevent the exercise of his independent volition. This impression has deepened into absolute conviction that such was the case upon reviewing the evidence. It is a well-settled proposition that the acts and contracts of persons who are of weak understanding, and who are, therefore, liable to imposition, will be held void if the nature of the act or contract justify the conclusion that the party has not exercised his deliberate judgment, but that he has been imposed upon by cunning or artifice, or undue influence. 1 Story, Eq. Jur. § 238.

The testimony in relation to testator's mental and physical condition after his sickness in 1884 is conflicting; but, from the evidence, I am convinced that he declined in both respects from that time until his death. His condition was such as to require great care and attention from some one, which was given him by his housekeeper. She so worked upon the fears of the old man, however, by threatening to leave him, that, to make sure of the continuation of her services, he married her. She was the fourth wife of a feeble old man of 84 years of age, and I am bound to believe it was a marriage prompted by convenience rather than affection. After this time, his children and grandchildren did not often visit him. His son, James C., continued to attend to some business for him; but, under the surveillance and criticism of Mrs. Stewart and Allaben, his son found his labors very disagreeable. Mrs. Stewart and Allaben dominated all testator's business affairs, and were jealous of any interference. Testator had intrusted his business affairs to his son, and had the utmost confidence in him, until a short time before this secret marriage, and the frequent visits of Allaben began. Proponents attempted to show that the visits of Allaben were simply those of an old friend, interested in his welfare; but I am satisfied from the evidence that a different object prompted these frequent visits. The relations between testator's son, James C., and his housekeeper and Allaben, were not friendly for some time

before the marriage took place; and the son was never permitted to see his father alone after 1884. Allaben made the old man believe that his son was not conducting his affairs honestly, and the breach, once opened, was assiduously widened both by Mrs. Stewart and Allaben; and the will of 1887, and the codicils, are simply the history of their success in this respect.

The attempt on the part of the proponents to blacken the character, and prove the incompetency, of James C. Stewart, has, in my opinion, signally failed. I am convinced that at all times he was an able, upright, and competent man of business, of excellent standing in the community, as will be seen by reference to the testimony of the well-known, reputable business men introduced in rebuttal by the contestants.

The evidence discloses, in brief, that the testator secretly married his housekeeper on December 9, 1886. His family became isolated from him. A few weeks afterwards, on March 12, 1887, he makes a new will, in which he singles out a disobedient granddaughter for a legacy, then divides his property equally among his wife and children, creating a trust, however, as to the shares of his son and one daughter, and appointing James R. Allaben managing executor, and his wife, son, and grandson executors,—a totally incompatible combination. This will materially diminishes the interest of the son; and it also forces upon him as co-executor a man with whom he could not serve with any self-respect. After the marriage became known to testator's family, they evinced the desire of making the best of it; but their treatment by Mrs. Stewart and Allaben soon put an end to any friendly overtures. By a codicil made March 10, 1888, testator removed his son, James C., as executor; and four months later he made another codicil, still further depleting his son's share in his estate, which was his last testamentary disposition, as he died in the September following. I am thoroughly convinced that the influence which prompted these testamentary changes was not that of gratitude, love, or esteem for his wife or Allaben, but was undue, and was exercised by them over this feeble old man in his dotage, making him their instrument in carrying out their ill-will and hatred towards his family, and particularly against his son, James C., for their own benefit and emolument. *Estate of Peck*, 10 N. Y. St. Rep. 698. Within three months after his marriage he made a new will, and cut off his son with a life-estate in one-quarter of his estate, and, in effect, gave Allaben the control of the estate. A few months later, he removed his son as executor, and, in reality, gave Allaben control; and, a few weeks later, he increased the wife's share at the expense of the son's. I have grave doubts as to the testator's capacity to clearly and entirely comprehend all the dispositions of this will and codicils, embodying, as it does, the statute of limitations, and other complex provisions.

The amount of undue influence which will be sufficient to invalidate a will must, of course, vary with the strength or weakness of the mind of the testator; and the influence which would subdue and control a mind naturally weak, or one which had become impaired by age, sickness, disease, intemperance, or any other cause, might have no effect to overcome or mislead a mind naturally strong. 1 Jarm. Wills, (Rand. & T. Ed.) 132. All these conditions pertained to this old man, which rendered the task of influencing him an easy one. "If it [the court] sees that any arts or stratagems, or any undue means, have been used; if it sees the least speck of imposition at the bottom; * * * if there be the least *scintilla* of fraud,—the court will, and it ought to, interpose." *Huguenin* v. *Baseley*, 14 Ves. 287. "It is impossible to define or describe with precision and exactness what 'undue influence' is. * * * Like the question of insanity, it is to some degree open and vague, and must be decided by the application of sound principles and good sense to the facts of each given case." *Lynch* v. *Clements*, 24 N. J. Eq. 434. Undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the

nature of the will, his family relations, the condition of his health and mind, his dependence upon and subjection to the control of the person supposed to have wielded the influence, the opportunity and disposition of the person to wield it, and the acts and declarations of such person. *Forman* v. *Smith,* 7 Lans. 443; *Tyler* v. *Gardiner,* 35 N. Y. 559; *Reynolds* v. *Root,* 62 Barb. 250; *Marvin* v. *Marvin,* 3 Abb. Dec. 192; *Lee* v. *Dill,* 11 Abb. Pr. 214; *Rollwagen* v. *Rollwagen,* 63 N. Y. 504; *McLaughlin* v. *McDevitt,* Id. 213; *Demmert* v. *Schnell,* 4 Redf. Sur. 409; *Sears* v. *Shafer,* 6 N. Y. 268; *Lake* v. *Ranney,* 33 Barb. 49; *Clark* v. *Fisher,* 1 Paige, 171. This aged and infirm old man, with perceptions blunted and memory impaired, readily fell into a state of dependence upon the persons who surrounded him, and insensibly their will was substituted for his. I am of the opinion that the evidence in this proceeding clearly shows that undue influence was practiced upon the testator, and that the will of 1887, and subsequent codicils, should not stand.

Let decree enter accordingly.